

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

JRS:SMS/DJM
F. #2024R00071

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

September 10, 2024

By ECF and E-Mail

The Honorable Joseph A. Marutollo
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

    Re:  United States v. Kwyme Waddell, et al.
       Docket No. 24-CR-351 (LDH)

Dear Judge Marutollo:

    The government respectfully submits this letter in support of its application for the entry of an order of detention pending trial for each of the seven defendants charged in the above-referenced case.  The defendants are all members and associates of the Folk Nation Gangster Disciples ("GD"), a violent street gang.  As alleged in the indictment, on Father's Day in June 2022, the defendants engaged in a violent drive-by shooting in Canarsie during which a victim was shot and hospitalized.

    For the reasons set forth more fully below, including the defendants' coordinated effort to commit the below-described violent crime, along with their violent criminal histories, the government submits that each of the defendants is both a flight risk and a danger to the community, and no combination of conditions can secure their appearance at trial and the safety of the community.[1]

I.  The Defendants' Crimes

  A.  Background

    GD has been a significant contributor to gun violence in Brooklyn for more than a decade, committing dozens of shootings, particularly drive-by shootings, in rival gang neighborhoods such as Canarsie, Brownsville and Prospect Park South.  GD operates in

---

    [1]  One of the defendants, Kwyme Waddell, is already detained pursuant to a previously entered order of detention.  See United States v. Kwyme Waddell, No. 22-CR-305 (ENV), ECF No. 9.

Brooklyn through several neighborhood-based subgroups, or "sets," including the "No Love City" set ("NLC"), which operates primarily in the area of Newkirk Avenue and Flatbush Avenue in Brooklyn, New York.  Members and associates of GD employ illicit means to earn money, including trafficking in counterfeit currency, drug trafficking and fraud.  A core tenet of GD is to engage in violence on behalf of the gang—whether in retaliation for perceived slights to the gang or to enhance the reputation of individual members within the gang in order to rise up through GD's ranks.  Members and associates of GD glorify gun violence through their use of social media, in which members and associates post content showing them with firearms, pantomiming firearms, and antagonizing rivals through online taunts and threats.  In GD, threats of violence often become acts of violence with members and associates engaging in "drills" in which they drive, often in a convoy of several cars, to rival gang territory in Brooklyn and indiscriminately shoot at groups of young people.

Within GD, certain members are viewed as leaders who, among other things, influence others to commit acts of violence on behalf of the gang.  Defendants Waddell and Alfarobarber are long-time members of GD who are leaders of NLC.  As discussed in detail herein, Waddell, Alfarobarber and co-defendants Rahim Frank, Mikey Jemison, Sebastien Jocelyn, Joel Myrie, and Jahi Nimmons flaunt their membership in and association with GD and NLC on their social media accounts and glorify participation in a violent street gang that inflicts terrible harm to our community.

Numerous members and associates of GD have been convicted of or charged with serious violent crimes in this District over the last several years.  See United States v. Brown, No. 20-CR-293 (WFK) (eleven GD defendants charged with racketeering offenses for seven gang-related shootings in 2020); United States v. Oluwagbenga Agoro, No. 21-CR-166 (WFK) (relating to a March 14, 2021 use of threatened use of force in furtherance of a plan to commit extortion); United States v. Powell, No. 21-CR-205 (LDH) (GD member charged with firearm possession in connection with a shooting); United States v. Cummings, No. 21-CR-406 (CBA) (GD associate charged with possessing multiple firearms on multiple separate occasions); United States v. Apollon, No. 21-CR-636 (DG) (GD member charged with robbery of vehicles from parking garage where parking attendant was permanently injured); United States v. Britton, No. 23-CR-406 (LDH) (GD leader charged with false statements and obstruction); and United States v. Zeigler, No. 23-CR-114 (MKB) (GD member charged with firearm possession in connection with a shooting).

In the present indictment, each defendant is charged with violent crimes in-aid-of racketeering, including murder conspiracy, attempted murder and assault, in violation of 18 U.S.C. § 1959(a), as well as related firearms offenses, in connection with their commission of the June 19, 2022 drive-by shooting discussed in detail herein.

B.    The June 19, 2022 Drive-By Shooting

On Father's Day 2022, the defendants engaged in a drive-by shooting in Canarsie, Brooklyn.  The defendants struck one 28-year-old victim, who survived his injuries after being hospitalized.

Three separate cars were involved in the shootings: an orange-colored Dodge Charger that was reported stolen by Enterprise car rental, a white-colored Honda sedan, and a gray-colored Honda sedan. In keeping with GD's practice in other drive-by shootings, each car and its occupants played an important and pre-planned role. One car (in this case, the Dodge Charger) carried the shooters and guns. The other two cars (in this case, the two Honda sedans) were decoy cars. The purpose of the decoy cars was to travel with the shooter car to and from the shooting so that if the police attempted to stop the shooter car, the decoy cars would slow down the police or draw their attention away so that the shooter could escape. Since the occupants in the decoy cars are typically unarmed, if they were stopped by law enforcement, they would be likely to avoid more serious charges.

Here, the three cars all drove in a convoy from NLC's territory in Flatbush, Brooklyn, to rival gang territory in Canarsie, Brooklyn. At the time of the shooting, Waddell, Jocelyn, Myrie and Alfarobarber were in the shooter car; Jemison was in the first decoy car; Frank and Nimmons were in the second decoy car. The cars were captured by surveillance video at more than 50 locations to and from the shooting. Approximately 24 minutes before the shooting, the cars gathered at a gas station where defendant Jocelyn got out of the front passenger seat of the Dodge Charger, went inside and paid the cashier and then pumped gas in the Charger. Photographs of Jocelyn walking from the Dodge Charger to the gas station store and then at the register inside the store are shown below.

 

While in Canarsie, the cars drove past a group of people and two occupants of the Dodge Charger opened fire at the crowd.[2] As noted above, one individual was hit and was hospitalized for a gun shot wound. The convoy sped off together and all of the defendants returned to NLC territory in Flatbush, Brooklyn, as captured on surveillance video.

---

[2] Ballistics evidence shows that four firearms were responsible for the 24 shell casings recovered at the scene. Based on the government's investigation to date, at least two of the firearms are believed to have been used by the defendants and one is believed to have been used by an individual standing on the sidewalk who retaliated against the defendants by firing back. There is no evidence that any of the defendants was hit or injured.

While in Flatbush, as captured on surveillance video, the Gray Honda stopped at a bodega before returning to NLC's block.  While stopped, defendant Myrie got out of the backseat and walked into the bodega.  Photographs of Myrie inside of the bodega are shown below.  These events took place less than 20 minutes after the shooting.



A few minutes later, Frank, Jemison and Nimmons were captured by surveillance video getting out of the second decoy car, as shown below.

**FRANK Exiting Gray Honda**                    **FRANK Social Media**

 

4

**NIMMONS Exiting Gray Honda**     **NIMMONS Earlier Same Day**




**JEMISON Exiting Gray Honda**     **JEMISON Earlier Same Day**




Approximately two minutes later, surveillance video footage captured Waddell, Jocelyn and Alfarobarber—the other three passengers of the shooter car—return to NLC's

territory together.  The still images provided below are from the surveillance footage from after the shooting compared against still images from the gas station surveillance footage from before the shooting.

**ALFAROBARBER Post-Shooting**　　　　**ALFAROBARBER Pre-Shooting**



**WADDELL Post-Shooting**



6

**WADDELL Pre-Shooting**



Additional surveillance video footage shows the defendants congregating, embracing and appearing to celebrate with each other less than half an hour after spraying a residential street with gunfire. For example, the video footage shows that Waddell, Alfarobarber and Jocelyn (the Dodge Charger occupants) immediately began mingling with the passengers of the Gray Honda, Frank, Jemison, and Nimmons. As another example, Nimmons and Alfarobarber, who were in separate cars during the shooting, appeared to be celebrating and hugging on the video footage upon seeing each other on the sidewalk. Still images showing Waddell and Nimmons, as well as and Nimmons and Alfarobarber, embracing after the shooting are provided below.

 

For this conduct, the defendants are each charged in the indictment with one count of conspiracy to murder rival gang members in-aid-of racketeering, in violation of 18 U.S.C.

7

§ 1959(a)(5) (Count One); one count of attempted murder in-aid-of racketeering, in violation of 18 U.S.C. § 1959(a)(5) (Count Two); one count of assault in-aid-of racketeering, in violation of 18 U.S.C. § 1959(a)(3) (Count Three); and one count of possessing, brandishing and discharging a firearm during a crime of violence, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i), (ii) and (iii) (Count Four).  If convicted of these crimes, they face a mandatory minimum sentence of 10 years and a maximum sentence of life.

      C.   The Defendants' Membership in and Association with GD

      As set forth above, each of the defendants are active members or associates of GD.  Each of the defendants has either acknowledged their gang affiliations on social media or by posing for photographs while making hand signs associated with GD.

      i.   Kwyme Waddell

      Waddell, also known as "K" and "Big Gun," has been a leader of NLC since at least 2013 and has long been a driver of gun violence in Brooklyn.  As relevant herein, on November 18, 2022, a trial jury sitting in the Eastern District of New York convicted four members of NLC of various crimes, including violent crimes in-aid-of racketeering stemming from four drive-by shootings variously committed by them and other members of GD in November 2020 (the "Trial").  See United States v. Agoro et al., No. 20-CR-293 (WFK).  During the Trial, a list of gang members created by NLC's top leader was presented as evidence, which referenced Waddell (through his nicknames "K"/"BIGGUN") as a member and leader of NLC.



      A review of Waddell's social media indicates that Waddell's account is titled "spmbkwym."  The term "SPMB," or "Stay Paid Money Burners," is commonly used by members and associates of NLC to signify their association with the gang.  In addition, the bio section of the Waddell's Instagram account states, "IM FROM NEWKIRK WERE WE SHOOT FIRST !! #RICHFLOCK #REXKLESS," followed by emojis for devil faces and "twirl" symbols, among others.  "Newkirk" is a reference to Newkirk Avenue in Brooklyn, New York, which is the center of NLC's territory. "#RICHFLOCK #REXKLESS" is a dedication to the memories of Richard James, also known as "Rich Flocks," and Malik Bhola, also known as "Rexk" and "Rexkless," two members of NLC who were murdered in 2014 and 2015, respectively.  "Twirl" is commonly used in connection with GD, including the term "twirlers" and the cyclone or "twirl" emoji.  Waddell's Instagram account includes various photographs of

him making GD hand signs or signs meant to signal disrespect to GD's rivals and photographs of Waddell with other NLC members.

ii. Paolo Alfarobarber

Alfarobarber, also known as "Chico," is a member and a leader of NLC who has a long history of involvement with GD and firearms usage. During the Trial, the same list of gang members referenced Alfarobarber (through his first name "Paolo") as a member and leader of NLC. A cooperating witness at the Trial also testified that Alfarobarber is a member and leader of NLC and that his nickname is "Chico."



In addition to the above-depicted list that references Alfarobarber as a member and leader of GD, social media accounts belonging to Alfarobarber indicate that he repeatedly associates with GD, posts about other members and associates of the gang, and uses references to signify his association with the gang. For example, Alfarobarber posted the below photograph to his Instagram account showing a diamond-encrusted gold necklace with the letters "SPMB," stacks of cash and a caption that spells out SPMB as "Stay Paid Money Burners," which is intended to signify his association with GD.

In addition, Alfarobarber posted the below photograph to his Instagram account with other GD members and captioned the photo, in part, #FREEDABIGGUN with twirl emojis and black heart emojis, which appears to be a reference to Waddell's July 2022 incarceration.



As of on or about September 8, 2024, the bio section of one of Alfarobarber's Instagram accounts shows that he continues to associate with GD. For example, as shown in the screenshot below, the account bio includes GD references, such as to "SPMB," which is written using emojis, as well as GD symbols, such as the twirl and devil emojis. As noted above, "SPMB," and the twirl and devil emojis are references intended to signify one's association with GD.



In addition, a cooperating witness has stated to law enforcement during the course of this investigation that the cooperating witness knew Alfarobarber, and other members of NLC, to sell drugs and possess firearms.  Indeed, in or about and between July 2020 and August 6, 2020, NYPD officers observed Alfarbarber conducting hand to hand transactions—which the officers, based on their training and experience, believed to be narcotics sales—in the vicinity of 2501 Newkirk Avenue, which as discussed herein is NLC's territory.  On or about August 6, 2020, NYPD officers also found Alfarobarber in possession of a Taurus .38 caliber revolver, loaded with six rounds of ammunition.[3]

Alfarobarber also engaged in fraud-related activity in connection with their association with GD, including unemployment fraud.  For instance, on or about April 18, 2024, Alfarobarber and one of his co-defendants, Jocelyn, exchanged private, direct messages using Instagram accounts to discuss their participation in fraud-related activity.[4]  In the messages, Alfarobarber and Jocelyn discuss having an individual open up a bank account on their behalf, a common tactic in fraudulent conduct.

**Linked Media File:** linked_media/unified_message_1150132113104250.jpg

**Author** gsavv00__ (Instagram: 317089196)
**Sent** 2024-04-18 23:37:13 UTC
**Body** I got a fresh 18yr old shawty

**Author** devilsteppa_ (Instagram: 39436810445)
**Sent** 2024-04-18 23:37:35 UTC
**Body** Make her go to Citibank on nostrand and newkirk

**Author** gsavv00__ (Instagram: 317089196)
**Sent** 2024-04-18 23:37:36 UTC
**Body** She has her ssn & id wit her

**Author** devilsteppa_ (Instagram: 39436810445)
**Sent** 2024-04-18 23:37:40 UTC
**Body** Open up

**Author** gsavv00__ (Instagram: 317089196)
**Sent** 2024-04-18 23:37:45 UTC
**Body** Aii

**Author** devilsteppa_ (Instagram: 39436810445)
**Sent** 2024-04-18 23:38:05 UTC
**Body** Probably going need $25 I'll send it once yall going to the bank

---

[3]     Following the filing of a motion to suppress the firearm on the basis of issues related to the firearm's seizure, the charges against Alfarobarber stemming from this arrest were dismissed without prejudice.  See 20-CR-316 (RPK).

[4]     This information was obtained via a judicially authorized search warrant signed by the Honorable Cheryl L. Pollak, United States Magistrate Judge.  See 24-MJ-2425 (CLP).

iii. <u>Rahim Frank</u>

Rahim Frank, also known as "Rah," is a member or associate of NLC.  During the Trial in November 2020, a cooperating witness identified him as an associate of NLC.

Frank also advertises his association with GD on social media.  For example, in or about April 2023, Frank's Instagram account posted a selfie depicting him using the "twirl" hand sign with his right hand, a GD hand sign, as depicted in the below photograph on the left.  He has also posted references to GD gang lingo, including a March 19, 2023 update to Facebook saying "Happy gday to me" with a black heart emoji, as depicted in the below photograph on the right.




Frank has also posted photographs of himself and other GDs to his social media accounts, including the below photograph in which some individuals appear to be pantomiming a firearm and others are throwing various GD-related hand signs.



In addition, Frank's social media accounts are replete with photographs and posts that indicate Frank is involved in fraud.  For example, in the photographs provided below, all of which Frank posted to his Instagram account, Frank either refers to several bank accounts at once or posts with stacks of cash.







    iv.  <u>Mikey Jemison</u>

        Mikey Jemison, also known as "CP," is a member of NLC.  Jemisons's social media postings frequently depict him with other members of GD and make references to GD, including Newkirk Avenue and twirls and black heart emojis.  For instance, on or about March 15, 2022, Jemison posted the below photograph to his Facebook account with the username "cpflexz," depicting himself and others (including his co-defendant Nimmons), wearing matching sweatshirts with the words "Lot 2 Flox," with Lot and Flox being GD references, printed in a colorful graphic on the front center of the sweatshirts.  In the same photograph, several individuals, including Jemison, are pantomiming a firearm with their hands, and there are numerous GD references throughout the comments section of the post, including references to "Opps," Newkirk, Floxks, twirl emojis and black heart emojis.



In addition, in the bio section of Jemison's Facebook account, Jemison makes additional references to GD, such as to Newkirk (NLC's territory) and uses twirl and black heart emojis, as shown in the photograph below.



As another example, Jemison posted the below photograph to his Instagram account showing several individuals throwing GD-related hand signs and captioned "No Love," a reference to NLC, followed by twirl emojis.



     v.  <u>Sebastien Jocelyn</u>

        Sebastien Jocelyn, also known as "Savi" and "Savii," is a member of NLC. Jocelyn's social media similarly contains multiple posts and references to his affiliation with GD. For instance, on or about July 25, 2022, Jocelyn (circled in red in the below left-side photograph) is seated next to Javanni Moise (circled in green), a member and leader of NLC known as "Bills" and "SPMB Bills."  In addition, on or about July 28, 2022, Jocelyn posted a story to his Instagram account appearing to wish a "Happy Birthday" to his co-defendant Alfarobarber, as shown in the still image provided below on the right-side.  In the post, Jocelyn tagged an Instagram account belonging to Alfarobarber.  Jocelyn also used several GD references and symbols in the post, including the words "Happy Gday" and the black heart, devil and twirl emojis, discussed herein.

 

On or about August 11, 2022, Jocelyn's Facebook account posted the following status update: "V2K Been My Gang Since Youth IFYKYK." "V2K" is a reference to "Vanderveers to Kirk," a phrase used by GD members to signify an alliance between NLC in Newkirk and the GD set located in the area of the Vanderveers public housing area in Brooklyn. As another example, on or about January 9, 2023, Jocelyn's Facebook account posted a status update tagging Waddell's Facebook account that said, in part, "free my boii." At the time of the post, Waddell was in federal custody at the Metropolitan Detention Center. The cooperating witness testified at the Trial that it was common for NLC members to post on social media about freeing fellow gang members from prison.

Jocelyn is also known to have a history of firearms possession, including a conviction from in or about March 2024, which is described below. In addition, on or about February 28, 2022, Jocelyn posted a video to his Instagram account of himself holding what appears to be a semi-automatic firearm in the video. A still image from the video is provided in the below left-side image. Jocelyn also posted a video to his Instagram account showing what appears to be Jocelyn, based on his eyes and nose, holding what appears to be a semi-automatic firearm in the video. A still image from the video is provided in the below right-side image.

 

And as described above, on or about April 18, 2024, Jocelyn, using his Instagram account, and Alfarobarber, using one of his Instagram accounts, communicated about fraud-related activity. Several photographs posted to Jocleyn's social media accounts of Jocelyn posting with large amounts of cash at once, further suggest that he is engaged in fraudulent activity. Two examples of those posts are provided below.

 

vi. <u>Joel Myrie</u>

Joel Myrie, also known as "Pookie," is a member of NLC. A cooperating witness at the Trial testified that Myrie is a member of NLC and that his nickname is "Pookie." During

18

the Trial (which Myrie attended with a group of other gang members to watch the cooperating witness's testimony from the gallery), the same list of gang members referenced above listed Myrie (through his alias "Pookie") as a member of NLC.



In addition, there are numerous references to NLC and GD throughout Myrie's social media.  For example, in July 2020, Myrie commented on another GD member's Instagram photo with six twirl emojis, a GD reference as discussed herein.  In addition, on or about April 22, 2021, Alfarobarber posted a video to one of his Instagram accounts wishing Myrie a "Happy GDay," which is how members and associates of GDs wish each other a Happy Birthday.  The black heart emoji is a commonly used symbol of GD.



     vii.  <u>Jahi Nimmons</u>

Jahi Nimmons, also known as "Jah" is a member of NLC.  Nimmons has also posted about his membership in GD on social media.  During the Trial, Nimmons and several

other members of GD came to watch the cooperating witness's testimony in an effort to intimidate him.  Nevertheless, the cooperating witness testified that "Jahi" is a member of NLC and pointed him out in the audience during the Trial.  He is also listed as a member of NLC on the above-described gang line up, which is depicted below.



In addition, there are numerous references to NLC and GD throughout Nimmons's social media.  As depicted in the photograph below, on or about October 2, 2023, Nimmons posted to his Facebook account promoting a music video in which other members of GD are visible.  In addition, Javanni Moise, who is described above as a member and leader of NLC, commented on the post with GD references, including the black heart emoji and twirl emoji.  Nimmons himself captioned or commented on the post, saying, in part, "#FREELOTS2FLOXKS," which is a GD reference.  Nimmons also used the black heart emojis, which as set forth above are associated with GD.



As another example, on or about April 14, 2023, Nimmons posted a status update to his Facebook account, writing "FREE THE WHOLE KIRK ALL MY GUYS AND RIP TO

THE TUGGS DEM 🖤🖤🖤.”  Law enforcement believes this status update to be a reference to GD.  For example, NIMMONS's statement "FREE THE WHOLE KIRK" is akin to Nimmons stating he wants all of the NLC members in jail or prison to be released, with "KIRK" being a reference to NLC's territory on Newkirk Avenue in Flatbush, Brooklyn.



As another example, Nimmons posted the below to his Instagram account, in which Nimmons captioned the photo "WE EBK CATCH A OPP AND WE SHOOTING THAT," indicating that if he sees a gang rival he and other GDs will shoot to kill that person. The caption further stated "WE KILLED YA MANS AND YOU KANT GET YA SHOOTER BACK," seemingly referring to a rival gang member who GDs had killed.



II.     The Defendants' Criminal Histories and Additional Relevant Information

     A.     Kwyme Waddell

Waddell has a significant history of violent and reckless conduct.  Waddell is currently detained for being a felon in possession of ammunition in connection with his attempt to murder several individuals on a crowded street in Brooklyn on or about March 22, 2022.  See No. 22-CR-305 (ENV), ECF No. 1.  The shooting was captured on video, as was Waddell's celebratory behavior immediately following the incident.  On May 5, 2023, Waddell pleaded guilty to the felon in possession of ammunition charge, in violation of 18 U.S.C. § 922(g), and is awaiting sentencing.  See id., ECF No. 27.

On September 27, 2013, Waddell was arrested for firearm possession.  While he was being arrested, he attempted to evade responsibility by asking his girlfriend to falsely claim ownership of the firearm.  Waddell was released on bail.  On July 11, 2014, he pleaded guilty to Criminal Possession of a Firearm: Possessing a Firearm, in violation of N.Y. Penal Law § 265.01-B(1), and remained on bail.  Two weeks later, Waddell was arrested on July 21, 2014 for driving a stolen car without a valid driver's license.  He was again released on bail.

On January 23, 2015, while on bail, Waddell attempted to shoot another individual to death.  He was not arrested for this offense until April 13, 2015.  In the interim, on January 25, 2015, he was arrested for driving while impaired with a fake driver's license and attempting to leave the scene of an accident.

On January 26, 2016, Waddell was charged in Kings County Supreme Court with numerous crimes, including conspiracies to commit murder and assault, as part of an arrest of multiple members of NLC.  See Indictment No. 6927-2015 (Kings Cty.) (the "2016 NLC Indictment").  As alleged in that indictment, throughout 2014 and 2015, Waddell directed members of NLC to engage in numerous drive-by shootings and other acts of violence and himself engaged in repeated criminal conduct, including firearms trafficking and smuggling contraband (including drugs and weapons) into the Rikers Island jail.

On May 1, 2017, Waddell resolved all of his pending state cases by pleading guilty to Conspiracy in the Second Degree: Intent to Perform a Class A Felony (specifically, murder), in violation of N.Y. Penal Law § 105.15, Assault in the First Degree: Intent to Cause Serious Injury with a Weapon, in violation of N.Y. Penal Law § 120.10(1), Attempted Murder in the Second Degree, in violation of N.Y. Penal Law § 125.25(1), Criminal Possession of a Weapon in the Second Degree: Loaded Firearm, in violation of N.Y. Penal Law § 265.03(1)(b), Possession of a Forged Instrument in the First Degree, in violation of N.Y. Penal Law § 170.30, Driving While Ability Impaired in the Second Degree, in violation of N.Y. Vehicle & Traffic Law § 1192(1), and Aggravated Unlicensed Operation of a Motor Vehicle in the Second Degree, in violation of N.Y. Vehicle & Traffic Law § 511(2).

On June 2, 2017, Waddell was sentenced to eight years' imprisonment for the assault, eight years' imprisonment for the attempted murder, eight years' imprisonment on his second firearm charge, 40 months' to 10 years' imprisonment on his murder conspiracy charge, one to three years' imprisonment on his forged instrument charge, 90 days' imprisonment on his

aggravated unlicensed operation of a motor vehicle charge, one year's imprisonment on his first firearms charge and a fine on his impaired driving charge. He was released to parole for a five-year term of supervision on October 20, 2021. Thus, Waddell was still under parole supervision when he committed the instant offense.

B.      Paolo Alfarobarber

Alfarobarber's criminal history indicates his dangerousness, involvement with narcotics, and affiliation with GD. On August 5, 2015, Alfarobarber was arrested for Criminal Possession of a Controlled Substance in the Third Degree: Narcotic Drug with Intent to Sell, in violation of N.Y. Penal Law § 220.16(1), Criminal Sale of a Controlled Substance in the Third Degree: Narcotic Drug, in violation of N.Y. Penal Law § 220.39(1), and Conspiracy in the Fourth Degree: Intent to Perform a Class B or C Felony, in violation of N.Y. Penal Law § 105.10(1).

On January 26, 2016, Alfarobarber was charged in the same 2016 NLC Indictment as Waddell, with Conspiracy in the Second Degree: Intent to Perform a Class A Felony, in violation of N.Y. Penal Law § 105.15, based on his participation in a conspiracy to commit Murder in the Second Degree with other members of NLC, and Conspiracy in the Fourth Degree: Intent to Perform a Class B or C Felony, in violation of N.Y. Penal Law § 105.10(1), based on his participation in a conspiracy to commit Assault in the First Degree and Criminal Possession of a Weapon in the Second Degree. One of Alfarobarber's principal roles in the conspiracies, as alleged in the 2016 NLC Indictment, was supplying other members of the gang with firearms.

On March 15, 2017, Alfarobarber resolved his pending cases by pleading guilty to Conspiracy in the Second Degree: Intent to Perform a Class A Felony, in violation of N.Y. Penal Law § 105.15, and was sentenced to a one- to three-year prison term. He pleaded on the same day to Criminal Possession of a Controlled Substance in the Third Degree: Narcotic Drug with Intent to Sell, in violation of N.Y. Penal Law § 220.16(1), and was sentenced to a one-year prison term.

And on July 26, 2023, Alfarobarber pleaded guilty to Attempted Criminal Sale of a Controlled Substance in the Third Degree: Narcotic Drug, in violation of violation of N.Y. Penal Law § 220.39(1). On November 1, 2023, he was sentenced to four years' probation.

C.      Rahim Frank

Frank does not have any prior convictions.

D.      Mikey Jemison

On January 27, 2024, Jemison pleaded guilty to a motor vehicle license violation, in violation of N.Y. Vehicle & Traffic Law § 509(1), and was sentenced on the same day to pay a $75 fine. This disposition was in full satisfaction of charges for Criminal Possession of a Controlled Substance in the Seventh Degree, in violation of N.Y. Penal Law § 220.03, Obstruction of Governmental Administration in the Second Degree, in violation of N.Y. Penal

Law § 195.05, and Aggravated Unlicensed Operation of a Motor Vehicle in the Third Degree, in violation of N.Y. Vehicle & Traffic Law § 511.

    E.    Sebastien Jocelyn

         Jocelyn has numerous prior arrests related to drug trafficking and firearms usage, many of which were consolidated.  On or about April 22, 2022, Jocelyn was arrested for, among other things, possession of a loaded Taurus 9mm handgun and alleged crack cocaine.  On May 2, 2022, he was charged with Criminal Possession of a Controlled Substance in the Third Degree: Narcotic Drug with Intent to Sell, in violation of N.Y. Penal Law § 220.16(1), Criminal Possession of a Weapon in the Second Degree: Loaded Firearm-Other Than Person's Home/Business, in violation of N.Y. Penal Law § 265.03(3), Criminal Possession of a Weapon in the Third Degree: Ammunition Feeding Device, in violation of N.Y. Penal Law § 265.02(8), Criminal Possession of a Controlled Substance in the Fifth Degree: Cocaine 500 milligrams, in violation of N.Y. Penal Law § 220.06(5), Criminal Possession of a Firearm, in violation of N.Y. Penal Law § 265.01-B(1), and Criminal Possession of a Controlled Substance in the Seventh Degree, in violation of N.Y. Penal Law § 220.03.  On March 15, 2024, he was convicted of Criminal Possession of a Firearm: Possession of a Firearm, in violation of N.Y. Penal Law § 265.01-B(1).  He is now awaiting sentencing.  However, because he was released on bail during the pendency of this state case, Jocelyn committed the instant offense while on pre-trial release.

    F.    Joel Myrie

         On September 7, 2021, Myrie was arrested in Nassau County and charged with Grand Larceny in the Third Degree: Property Value Exceeds $3,000, in violation of N.Y. Penal Law § 155.35(1).  The case was eventually transferred to Nassau County Court where he was arraigned on March 31, 2022 in connection with the same grand larceny charge, as well as Petit Larceny, in violation of N.Y. Penal Law § 155.25.  On October 17, 2022, he pleaded guilty to the petit larceny charge, and was later sentenced to three years' of probation.  Since he was released on his own recognizance during the pendency of his case, Myrie committed the instant offense while on pre-trial release.

24

G.     Jahi Nimmons

On January 29, 2021, Nimmons was arrested and charged with Robbery in the First Degree: Cause Serious Injury, in violation of N.Y. Penal Law § 160.15(1) and Gang Assault in the First Degree:  Cause Serious Physical Injury, in violation of N.Y. Penal Law § 120.07.  The case was eventually transferred to New York County Supreme Court where he was charged on February 11, 2021 with the same robbery and gang assault charges, as well as Robbery in First Degree: Use/Threatens Use of Dangerous Instrument, in violation of N.Y. Penal Law § 160.15(3).  On April 19, 2023, he pleaded guilty to Assault in the Second Degree: With Intent to Cause Serious Physical Injury, in violation of N.Y. Penal Law § 120.05(1), and was later sentenced to one day of incarceration and three years' of probation.  Since he was released on bail during the pendency of his case, Nimmons committed the instant offense while on pre-trial release.

III.   Legal Standard

The court "shall order" a defendant detained if it finds that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."  18 U.S.C. § 3142(e)(1).  The government bears the burden of persuading the court by a preponderance of the evidence that the defendant is a flight risk or by clear and convincing evidence that the defendant is a danger to the community.  United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001).  In cases such as this, however, where there is probable cause to believe a defendant has violated 18 U.S.C. § 924(c), there is a statutory presumption that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community."  18 U.S.C. § 3142(e)(3)(B).  Even if a defendant can overcome that presumption, the special risk of dangerousness posed by defendants who have committed such crimes "remains a factor to be considered among those weighed by the district court."  Mercedes, 254 F.3d at 436.

The government may proceed by proffer to establish facts relevant to a detention determination.  United States v. Ferranti, 66 F.3d 540, 541 (2d Cir. 1995).  Furthermore, "[t]he rules of evidence do not apply in a detention hearing."  Id. at 542.  As the Second Circuit has explained:

> [I]n the pre-trial context, few detention hearings involve live testimony or cross examination.  Most proceed on proffers.  See United States v. LaFontaine, 210 F.3d 125, 131 (2d Cir. 2000).  This is because bail hearings are "typically informal affairs, not substitutes for trial or discovery."  United States v. Acevedo-Ramos, 755 F.2d 203, 206 (1st Cir. 1985) (Breyer, J.) (quoted approvingly in LaFontaine, 210 F.3d at 131).  Indeed, § 3142(f)(2)(B) expressly states that the Federal Rules of Evidence do not apply at bail hearings; thus, courts often base detention decisions on hearsay evidence.  Id.

United States v. Abuhamra, 389 F.3d 309, 320 n.7 (2d Cir. 2004).

Whether detention is sought on the basis of flight or dangerousness, the Bail Reform Act lists four factors to be considered in the detention analysis: (1) the nature and circumstances of the crimes charged, "including whether the offense is a crime of violence . . . or involves a . . . firearm"; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including "whether, at the time of the current offense or arrest, the person was on probation [or] on parole"; and (4) the seriousness of the danger posed by the defendant's release.  See 18 U.S.C. § 3142(g).  Specifically, in evaluating dangerousness, courts consider not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and witnesses, but also "'the danger that the defendant might engage in criminal activity to the detriment of the community.'"  United States v. Millan, 4 F.3d 1038, 1048 (2d Cir. 1993) (quoting legislative history).

IV.   Argument

No bail package will protect the community from the danger posed by the defendants.  Each of the four factors set forth in Section 3142(g) militate in favor of their pretrial detention, and as to all defendants, there is a statutory presumption that the defendants pose a danger and a risk of flight.

First, all of the defendants are charged with crimes of violence and crimes that "involve[] a . . . firearm." 18 U.S.C. § 3142(g)(1).  The violent conduct alleged in the Indictment—murder conspiracy, attempted murder, assault, and firearms offenses—involved a highly coordinated and indiscriminate shooting into a crowd of people.  This wanton violence demonstrates the severe danger these defendants pose.  See United States v. Williams, No. 20-CR-293 (WFK), 2020 WL 4719982, at *2 (E.D.N.Y. Aug. 13, 2020) (holding magistrate judge erred in releasing on bail defendant who possessed a firearm in connection with an allegedly gang-motivated shooting); see also United States v. Destine, No. 20-CR-293 (WFK), 2022 WL 2181453, at *2-3 (E.D.N.Y. June 16, 2022) (finding nature of offense weighed against release for GD member charged with driving a decoy car during a shooting).

Second, the weight of the evidence against the defendants is overwhelming.  As described above, law enforcement collected surveillance video from more than approximately 50 camera locations through Brooklyn, New York, which depict the three-car caravan consisting of the Dodge Charger, the White Honda and Gray Honda leaving the vicinity of Flatbush, Brooklyn, traveling across Brooklyn to the Canarsie neighborhood, and committing the shooting in the vicinity of East 94 Street and Avenue K in Canarsie.  The video footage then shows that after the shooting the three-car caravan then traveled back to the Flatbush area.  In addition, two of the cars (the Dodge Charger and Gray Honda) are captured on surveillance video arriving back in the vicinity of Newkirk Avenue and East 23rd Street, a known homebase of the NLC. Notably, all of the defendants are identifiable through the collection of these videos.  Moreover, ballistics evidence was recovered from the scene of the shooting, including shell casings.  See United States v. Zhang, 55 F.4th 141, 151 (2d Cir. 2022) (where the evidence of a defendant's guilt is strong, "it follows that the defendant faces an elevated risk of conviction (and of the attendant punishment), and therefore may present an elevated risk of flight").

Moreover, every defendant is subject to a mandatory minimum term of imprisonment of 10 years, and a maximum potential sentence of life  The government currently

estimates that, for purposes of the United States Sentencing Guidelines (the "Guidelines"), Waddell faces a Guidelines range of 355 to 413 months' imprisonment (based on criminal history category VI) and Alfarobarber faces a Guidelines range of 288 to 330 months' imprisonment (based on at least criminal history category III).  The remaining defendants— Frank, Jemison, Jocelyn, Myrie, and Nimmons—each face a Guidelines range of 255 to 288 months' imprisonment (based on at least criminal history category I). The likelihood of a lengthy term of imprisonment for each defendant gives them a strong incentive to flee and greatly minimizes any risk that pre-trial detention would result in an over-served sentence.  See Destine, 2022 WL 2181453, at *3 ("Further, if convicted, Defendant faces a mandatory minimum sentence of ten (10) years of incarceration and a maximum sentence of life.  The likelihood of a lengthy sentence gives Defendant a strong incentive to flee."); Williams, 2020 WL 4719982, at *2 (Guidelines range of "92 to 115 months' imprisonment" gave defendant "a strong incentive to flee"); United States v. Bruno, 89 F. Supp. 3d 425, 431 (E.D.N.Y. 2015) ("When evidence of a defendant's guilt is strong, and when the sentence of imprisonment upon conviction is likely to be long a defendant has stronger motives to flee.").[5]

       Third, the defendants' history and characteristics weigh heavily in favor of detention.  The defendants are each active members and associates of a violent street gang, some of whom committed the charged crimes while on parole or pre-trial release, including Waddell, Myrie, Jocelyn and Nimmons.  See Williams, 2020 WL 4719982, at *3 (defendant's membership in GD and commission of offense while on parole weighed against release).  Certain defendants, including Waddell and Alfarobarber, have a long history of association with GD and its criminal activities.  Waddell's felon in possession of ammunition charge also stemmed from his attempt to murder several individuals on a crowded street in Brooklyn on or about March 22, 2022, only three months before the instant offense.  And even though the charges were ultimately dismissed, Alfarobarber was evidently not deterred by his August 6, 2020 firearms arrest given his participation in this drive-by shooting less than two years later.  Those histories demonstrate that the defendants pose an unacceptable risk to the community if they were to be released.

       Fourth, the risk of further violence and flight by the defendants is severe.  Courts have consistently held that where a defendant is associated with a violent criminal organization, no conditions—even stringent conditions of home confinement—are sufficient to protect the community.  See United States v. Irizzary, No. 17-CR-283 (LAP), 2020 WL 1705424, at *3 (S.D.N.Y. Apr. 8, 2020) ("Even under normal conditions, electronic monitoring does not suffice to restrain violent criminals who, like [the defendant], are members of organized gangs."); Choudhry, 941 F. Supp. 2d at 359 ("It is well established that home detention and electronic monitoring may be insufficient to protect the community against dangerous individuals, particularly where those individuals have the ability to command others to do their bidding."); United States v. Gotti, 219 F. Supp. 2d 296, 299 (E.D.N.Y.) ("In circumstances where the government has demonstrated that a defendant is a leader of an organized crime family, the Second Circuit has uniformly held that the defendant is dangerous because inherent in the leadership position is the supervision of criminal activity that cannot be curtailed by any

---

      [5]    See, e.g., United States v. Scali, 738 F. App'x 32, 33 (2d Cir. 2018) ("The court reasonably determined that [defendant's] Guidelines range of 87-108 months' imprisonment was significant enough to provide an incentive to flee").

condition or combination of conditions of release."), aff'd sub nom. United States v. Ciccone, 312 F.3d 535 (2d Cir. 2002).[6]

    Accordingly, the § 3142(g) factors each compel detention in this case, demonstrating that the defendants cannot be released without risking the safety of the community and the likelihood that they will not return to court as required.  That is especially true in light of the statutory presumption—that the defendants cannot overcome—that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community."  18 U.S.C. § 3142(e)(3)(B).  The defendants should therefore be detained.

V.  Conclusion

    For the reasons set forth above, the government respectfully submits that no condition or combination of conditions will properly assure the safety of the community or the defendants' return to court if the defendants are released on bail, and therefore requests that the Court order that the defendants be detained.

       Respectfully submitted,

       BREON PEACE
       United States Attorney

   By:  _/s/_____
       Dana Rehnquist
       Sophia M. Suarez
       Daniel J. Marcus
       Assistant U.S. Attorneys
       (718) 254-7000

cc:  Clerk of the Court (LDH) (by ECF)
   Counsel of Record (by ECF)

---

[6]  See also United States v. Orena, 986 F.2d 628, 632 (2d Cir. 1993) ("electronic surveillance systems can be circumvented by the wonders of science and of sophisticated electronic technology"); accord United States v. Brennerman, 705 F. App'x 13, 16 (2d Cir. 2017); United States v. Dono, 275 F. App'x 35, 37 (2d Cir. 2008); United States v. Kelly, No. 19-CR-286 (AMD), 2020 WL 2528922, at *3 (E.D.N.Y. May 15, 2020) ("Nor are the defendant's proposed measures—that he be kept on home confinement and monitored by pretrial services—sufficient to eliminate the danger to the community.").